IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA M. KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: |
| v. | ) | |
| | ) | _____ |
| HYUNDAI MOTOR  MANUFACTURING | ) | |
| ALABAMA, LLC, | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Lashundra King, by and through her attorneys at Wiggins Childs Pantazis Fisher & Goldfarb, LLC, as and for Plaintiff's Complaint and Jury Demand in this action against defendant Hyundai Motor Manufacturing Alabama, LLC (hereinafter "Hyundai" or "defendant"), respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action against defendant Hyundai Motor Manufacturing Alabama, LLC (hereinafter "Hyundai" or "defendant") under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§2000e *et seq.* (hereinafter "Title VII"), specifically as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. §2000e(k), the Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C. § 2000gg-2000gg-6, the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 1201 *et seq.*, and the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), for its unlawful employment practices against plaintiff based on her sex, her pregnancy, her disability, and her protected activity. This action seeks declaratory, injunctive, and

1

equitable relief, as well as monetary damages, to redress defendant's violations of Title VII, the PWFA, the ADA, and the FMLA, including unlawful discrimination based on sex, including sexual harassment, pregnancy and disability discrimination, failure to accommodate, FMLA interference, and retaliation against Plaintiff.

2.     The suit is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§2000e *et seq.*, and the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) (hereinafter "Title VII"), the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-2000-gg-6 ("PWFA"), and the Americans with Disabilities Act, 42 U.S.C. §12112(a) ("ADA"), which provide for relief from discrimination on the basis of sex, pregnancy, disability, and retaliation. Plaintiff seeks declaratory relief, injunctive relief, and other equitable remedies, including backpay and reinstatement, as well as compensatory and punitive damages, costs, attorneys' fees and expenses.

3.     Defendant violated Title VII, by permitting Plaintiff's supervisor, Clayburn Manning, and other male employees to sexually harass her and then retaliated against her after she engaged in protected activity. Defendant violated Title VII, the PWFA, and the ADA when it failed to accommodate Plaintiff's diagnosed physical and mental health disabilities associated with her pregnancy. Defendant violated the FMLA when it interfered with her right to take medical leave due to physical and mental health disabilities associated with her pregnancy. Defendant violated the retaliation provisions of Title VII, the PWFA, the ADA, and the FMLA when it retaliated against her for seeking reasonable accommodation for physical and mental health disabilities associated with her pregnancy.

4.     Defendant's unlawful conduct was knowing, malicious, willful, and wanton and/or showed a reckless disregard for Plaintiff's protected rights, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages.

## PARTIES

5.     Plaintiff Lashundra M. King (hereinafter referred to as "plaintiff" or "King") is a female citizen of the United States, is over the age of nineteen (19) and was a resident of the State of Alabama during the relevant time period. Plaintiff was employed by defendant Hyundai Motor Manufacturing Alabama, LLC at all times relevant to this action.

6.     Defendant, Hyundai Motor Manufacturing Alabama, LLC (hereinafter "defendant" or "Hyundai") is an "employer" subject to suit under Title VII. Defendant does business in this district and, at all times relevant to this action, Defendant was Plaintiff's employer within the meaning of Title VII. At all times relevant to this action, Defendant employed at least fifteen (15) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the applicable calendar year. Defendant conducts business in Montgomery County, Alabama.

## JURISDICTION & VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(a)(4), as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII, the PWFA, the ADA, and the FMLA. This action is authorized and instituted pursuant to Title VII, as amended, 42 U.S.C. §2000e-5(f)(3), the PWFA, as amended, 42 U.S.C. §§ 2000gg-2000gg-6, the ADA as amended, 42 U.S.C. §§ 12101 *et seq.*, and the FMLA as amended, 29 U.S.C. §§ 2601 *et seq.*

8.     The court may exercise supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1376.

9.     Venue is proper in this district because a substantial part of the events or omissions giving rise to this claim occurred in this district.

10.    Plaintiff requests a jury trial on all equitable claims and defenses and all issues triable by jury.

## PROCEDURAL REQUIREMENTS

11.    On or about May 7, 2024, Plaintiff timely filed a charge of discrimination under Title VII with the Equal Employment Opportunity Commission ("EEOC") against Defendant, which was assigned Charge Number 420-2024-02557, which alleged discrimination on the basis of sex, including pregnancy discrimination and sexual harassment, disability, and retaliation. (Exhibit 1, Charge of Discrimination). Plaintiff filed the charge within 180 days of the occurrence of one or more of the alleged employment practices that violated Title VII and the ADA.

12.    On September 10, 2024, the EEOC issued Plaintiff Notice of Right to Sue for Charge Number 420-2024-02557. (Exhibit 2, Notice of Right to Sue). Plaintiff has timely filed this Complaint within 90 days of receipt of that notice.

13.    Plaintiff's FMLA claims do not require administrative exhaustion.

## FACTUAL ALLEGATIONS

14.    Plaintiff alleges and incorporates by reference the factual allegations in the preceding paragraphs.

15.    Plaintiff, Lashundra M. King, is an African American female.

16.     On or about October 31, 2022, Defendant and MS Companies, a Temporary Employment Agency, hired King as a Production Team Member in the Quality Control Department.

17.     During this time period, Plaintiff was formally employed by MS Companies and was a temporary employee and a trainee of Defendant.

18.     Defendant originally assigned King to work in the Paint Department, which was a position she enjoyed. Plaintiff performed her job satisfactorily and competently.

19.     Plaintiff's Group Leader was Clayburn Manning.

20.     Manning began to sexually harass Plaintiff by making unsolicited comments, touching her without her permission, and sending her inappropriate text messages.

21.     During February 2023, Plaintiff lost consciousness and passed out while at work. Plaintiff was taken to the medical clinic and was told that she could not return to work until she saw a doctor.

22.     After this episode, Plaintiff went to the doctor where she learned she was pregnant. The doctor cleared Plaintiff to return to work after a few days off.

23.     When Plaintiff returned to work, Plaintiff told Human Resources Representative Kendra (LNU) that she was pregnant. Plaintiff asked Kendra if she needed to turn in paperwork that reflected that she was pregnant, and Kendra told her that was not necessary. Instead, Kendra told Plaintiff to fill out a Personal Leave Request for the dates February 25, 2023, through March 1, 2023, and return it to Team Relations.

24.     Plaintiff submitted the form to Team Relations, and Defendant approved her personal leave. Despite the fact that Defendant approved Plaintiff's leave, Patrick disciplined Plaintiff for missing work.

25. After Plaintiff returned to work, she experienced cramping and bleeding when she was assigned to work certain jobs. Plaintiff informed her Supervisor Patrick (LNU) that her doctor had told her that bleeding and cramping meant she was at an increased risk for miscarriage. For example, Plaintiff told Patrick that jobs which required her to climb in and out of cars aggravated her condition.

26. Patrick refused to accommodate Plaintiff's request not to be required to perform jobs which caused cramping and bleeding.

27. On or about March 26, 2023, Plaintiff experienced further complications from her pregnancy which included internal bleeding, which required her to leave work and seek medical treatment at an emergency room. The treating physician instructed Plaintiff to take off work for a few days.

28. When Plaintiff returned to work, Patrick disciplined King for missing work even though she told him that she was pregnant and had experienced a medical emergency and had unused paid time off available to her.

29. Plaintiff asked Patrick why she couldn't use her vacation days and pointed out that other employees had been permitted to use paid time off for medical emergencies.

30. The Defendant's Human Resources Representative asked Patrick "why they didn't use her vacation days as [Plaintiff] was experiencing a medical emergency", Patrick responded that he did not know.

31. The Human Resources Representative asked Patrick, "do you want to go ahead with the write up?" and he replied, "yes."

32.    Plaintiff subsequently went to the Human Resources Department and spoke with Human Resources Representative Dorothy Tabb and told her what had happened. Tabb gave Plaintiff a medical form and told her that, once she completed it and returned it to Human Resources, the discipline would be removed.

33.    In April 2023, Plaintiff had another bleeding episode at work, was taken to medical, and subsequently to the hospital. Plaintiff was put on bedrest for the remainder of her pregnancy.

34.    Plaintiff eventually suffered a subchorionic hematoma and was placed on bed rest for the remainder of her pregnancy and in an attempt to protect her unborn child.

35.    While Plaintiff was out on short term disability, Group Leader Manning continued to sexually harass her by sending her unwanted and inappropriate text messages.

36.    During this time, Plaintiff suffered from extreme anxiety that she might lose her baby and also that she might lose her job.

37.    On May 31, 2023, Plaintiff miscarried and lost her baby. Plaintiff began to suffer from postpartum depression and had to have surgeries related to her pregnancy and miscarriage in June 2023 and against in August 2023.

38.    During August 2023, Plaintiff returned to work. When Plaintiff returned to work, Manning attempted to hug her. Plaintiff objected and told Manning not to touch her.

39.    The following day, Plaintiff was one (1) minute late to work, and Manning wrote her up.

40.    On August 26, 2023, Plaintiff had to undergo surgery due to complications from her pregnancy. While Plaintiff was hospitalized, Manning asked her to send pictures of herself with her gown open.

41.    On October 9, 2023, Plaintiff returned to work and Manning once again attempted to hug her. Once again, Plaintiff objected and told Manning not to touch her.

42.    The following day, Plaintiff was again one (1) minute late to work, and Manning wrote her up.

43.    Plaintiff met with Human Resources Representative Amber (LNU), Department Manager Karen (LNU), and Group Leader Shawn Godwin. They informed her that she was being placed in Phase 2. Plaintiff asked how was that possible since she was on Phase 1 when took leave, and Tabb had told Plaintiff that discipline would be removed from her record. Plaintiff objected to the discipline and began to cry, which was a common occurrence since she was suffering from postpartum depression. Amber said, "I don't care why you are crying, but I'll look into the request."

44.    During November 2023, Manning approached Plaintiff while she was working on the assembly line and touched Plaintiff's breast. The incident was unwelcome and offensive to Plaintiff.

45.    Plaintiff complained to Assistant Manager Tony (LNU) that Manning had touched her breast. Tony told Plaintiff "we all need to get along." Plaintiff told Tony that she needed to speak with Team Relations, but Tony refused to call the Human Resources Department.

46.    A co-worker helped Plaintiff speak to Plant Manager Matt (LNU), who called the Human Resources Department for Plaintiff.

47.    On or about November 17, 2023, Plaintiff formally complained to Defendant's Human Resources Department and to the MS Companies representative that Manning and a group

of married men were sexually harassing her. Among Plaintiff's complaints were that Manning had sexually assaulted her and sent her vulgar text messages.

48. Plaintiff specifically complained that Manning had touched her breast and provided Defendant with screenshots of the text messages Manning sent her. Plaintiff also told Defendant's Human Resources Department that she was suffering from postpartum depression.

49. After Plaintiff complained, the MS Companies representative told Plaintiff that Defendant wanted to fire her, but that she had talked them out of firing her.

50. Instead, Defendant moved Plaintiff from her position in the Paint Department to a much more physically demanding job.

51. On or about December 15, 2023, Defendant terminated Manning. Defendant did not terminate the other men about whom Plaintiff had complained.

52. Plaintiff's coworker, Shunna, who worked the night shift told her that Tony told her the Defendant would eventually hire Manning back and that management sticks together. Shunna told King that she needed to be careful, because they will try to find some way to get rid of her.

53. Defendant required Plaintiff to sign a confidentiality agreement and was told not to speak about what had happened. Plaintiff did not understand everything written in the agreement, so she asked to see Team Relations so she could get a better understanding. She informed the relief person James (LNU) that she needed to go and see Team Relations. About 10-20 minutes later, a relief person team member named Ty relieved Plaintiff. Ty worked in Plaintiff's spot while Plaintiff went to the Human Resources Department and spoke with

Amber. Plaintiff told Amber she was concerned about other people finding out because she was told that nothing would be told and no one would find out her name, but people seemed to know anyway.

54. When Plaintiff returned to the line, Tony told Plaintiff that she was being written up for leaving the line without permission. Plaintiff told Tony that someone had been sent to work in her spot and that they were the ones who sent the guy down to replace her. Tony told Plaintiff that he was not told that she needed to go see Team relations. Plaintiff did not see how that was possible since the Human Resources Department had sent a person down to relieve her. Tony wrote her up anyway. Plaintiff told Tony that she knew what this really about: it was because she had reported Clay Manning for sexual harassment. Tony did not respond. Plaintiff again asked Tony how was this her fault and stated that they knew about Manning's behavior long before she started working there. Tony said that she should report it to the EEOC.

55. In March 2024, Tony came up to Plaintiff one day asking how long she'd been in the restroom and asked if she had signed the paper. Plaintiff stated that nobody ever signs the paper. She asked Tony if they ever say anything to Steven or anyone else when they go to the restroom and stay 20 minutes multiple times a day. He gave no response. Plaintiff stopped going to the restroom as much. She just started holding it and she still does just to keep from him saying anything to her or give him a reason to write her up.

56. During March 2024, Tony continued to harass Plaintiff and scrutinize her work. Tony came up to Plaintiff on the line and asked her, "are you doing your job, are you checking all the cars?" She responded and asked him, "don't I always do my job right?" He replied with,

"yes, you do." She asked her coworker, Brenda (LNU), who was working beside her if Tony said anything to her about her job and Brenda said no.

57.   In March 2024, Group Leader Godwin came up to her on the line and said, "Tony told me to tell you to make you sure you sign off on all the cars, and to check all the cars." Plaintiff asked Shun, "don't I always do my job right." GL Shun replied "yes, you do." Plaintiff asked Shun if she was going to tell everyone else who worked in this position (Confirmation). GL Shun replied "yes, I am". Plaintiff asked her other co-workers if that had been asked of them and they all said no.

58.   In March 2024, Tony called Plaintiff to his desk and informed her that she hadn't filled out a form needed for her FMLA that she used for February 15, 2024. Tony told Plaintiff that he "had two notifications from medical stating that she needed to submit the FMLA form" (FMLA personal certification form). She asked Tony why he hadn't told her this when he received the first notification. He did not respond. Plaintiff asked where she needed to go to submit the form. He told her to "go under benefits FMLA personal certification form." Tony then told Plaintiff that she'd be getting a DP because she did not fill out the form." She asked him, "how am I getting a disciplinary action for something you were supposed to have told me with the first notification and did not, when I had never used FMLA before."

59.   Plaintiff informed Tony that she had a doctor's appointment with her psychiatrist & therapist for postpartum depression. She asked Tony what she needed to do for her FMLA.

60.   He then told Plaintiff that she needed to call medical, and they will inform him that she would be using FMLA and what days would be missed. Tony told Plaintiff to contact New

York Life and inform them of the day she would be missing and then he had her call Jenny Nesse in medical in front of him from the work phone and gave her the number on a piece of paper when she needed to use it again.

61.  Plaintiff asked Tony if that was all she needed to do, and he said yes. He then said, "let me call Darius from HR to come and speak with you to help you with your FMLA." Darius never came. Tony then wrote down the medical number on the piece of paper and stated that's all she had to do and said they'd notify them.

62.  In April 2024, Plaintiff was written up for using her FMLA and STD to attend her medical appointments for postpartum depression with her psychiatrist.

63.  In April 2024, Plaintiff was written up when she had Covid March 25- April 1, 2024. She was written up for March 27, March 28 and April 1, 2024. Defendant told Plaintiff that she did not follow the protocol. On March 26 or 27, 2024, Plaintiff called the Human Resources Department and informed them of her return date. Plaintiff tired to get in touch with Tony and gave them her number to give to Tony. The Human Resources Department told Plaintiff they had dropped Tony off at a meeting and that he had her telephone number, her medical status, and her return date. Plaintiff also tried to call Tony from another shift but he did not answer. Plaintiff contacted medical and informed them of her status and her return date, they also get notification from New York life of her status and return date. She gave them proof of her calling, showing how long she spoke to HR during the meeting.

64.  Plaintiff was out on FMLA from March 24, 2024, through April 1, 2024.

65.  On April 1, 2024, Plaintiff attempted to return to work but was sent home by medical because they said she had not called in even though she had called in.

66.    Upon information and belief, Plaintiff's coworkers were not written up for not calling in when being sent home by medical.

67.    On April 10, 2024, Plaintiff had a meeting with the Corrective Action Committee and asked Amber if she could have copies of all of her write ups. Amber told her yes but continued to put her off and has not provided them to her. Plaintiff asked Tony if her write-ups had been given to him and he said no.

68.    Plaintiff asked Ella, her team leader, if she could call HR team relations & call Amber team relations for her. Amber never came to see Plaintiff, but she did come to Tony's desk and spoke with him but never came and spoke with Plaintiff. Plaintiff then called Amber on the telephone & asked for emails so they could communicate in writing. Plaintiff emailed asking Amber to print out her write-ups. Amber replied that she could not, even though she had previously said she could.

69.    Later in April 2024, Amber and Plaintiff set up a meeting so that Plaintiff could complain about harassment and retaliation she had been subjected to after reporting Clay Manning for sexual harassment, to discuss the write ups she got when she was pregnant, and her current write up for her STD/FMLA.

70.    Unknowingly to Plaintiff, Tony was present during the meeting. Plaintiff asked Amber if they could communicate through emails. Amber told Plaintiff that they did not need emails to communicate and told Plaintiff she could take notes during the meeting. Plaintiff stated to Amber again that she would like to communicate through emails.

71.    On April 19, 2024, Tony came up to Plaintiff on the floor and stated to her that he had spoken with legal department and that they could give her the write-ups. Plaintiff asked

13

Tony why he had to speak to legal for her to get copies of her write ups. Tony did not respond and then he stated, "do you need to sit down? Plaintiff asked why she'd need to sit down & he replied because she was shaking.

72. From April 19, 2024, until June 25, 2024, Plaintiff was on STD/FMLA leave because her postpartum depression and her struggles at work were adversely affecting her mental health.

73. Once Plaintiff returned to work, Tony continued to harass Plaintiff and scrutinize her behavior much more closely than he did other employees.

74. For example, in September 2024, Tony wrote her up for calling in six (6) minutes late when she needed to use FMLA leave for an unforeseen medical emergency.

75. During September 2024, Plaintiff asked to be relived so she could use the restroom. Tony did not send anyone for over an hour, which caused Plaintiff extreme discomfort since, if she had left, the assembly line would have shut down and she would have expected to be disciplined.

76. Upon information and belief, Tony tends to other employees who need to leave the line much more promptly.

**V.    DAMAGES**

77. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful conduct as set forth herein unless enjoined by this Court.

78. Plaintiff has suffered embarrassment, humiliation, shame, damage to reputation, mental distress, emotional and physical pain and anguish and lost wages and other pecuniary losses as a consequence of Defendant's unlawful conduct.

14

79.    Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory, punitive and liquidated damages is her only means of securing adequate relief.

**FIRST CAUSE OF ACTION**
**Discrimination (Harassment) on the**
**Basis of Sex in Violation of Title VII**

80.    Plaintiff alleges and incorporates by reference the factual allegations in the preceding paragraphs.

81.    Defendant intentionally discriminated against Plaintiff on the basis of her sex with regard to discipline, and other terms and conditions of employment.

82.    The actions of Defendant, through its agents, other employees and managers, created a hostile work environment for Plaintiff which was based on sex and was continuous in nature during her employment. The hostile work environment was a continuing violation of Title VII.

83.    Defendant had actual and constructive knowledge of the sexual harassment and discrimination because the harassment was open and obvious and because managerial employees participated in the harassment, but Defendant failed to take prompt action to correct or eliminate the harassment.

84.    Defendant engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

85.    As a result and consequence of Defendant's actions, Plaintiff has suffered pain, financial damage, embarrassment, trauma and humiliation.

SECOND CAUSE OF ACTION
**Retaliation (Harassment) in Violation of Title VII**

86.     Plaintiff re-alleges all of the allegations in the complaint and incorporates the same by reference herein.

87.     Plaintiff engaged in protected opposition to illegal discrimination when she complained of sexual harassment and of retaliation for her complaints.

88.     Plaintiff engaged in protected activity to illegal discrimination when she complained about sexual harassment.

89.     Defendant discriminated against Plaintiff on the basis of retaliation with respect to discipline, other terms, conditions, and privileges of employment in violation of Title VII.

90.     The actions of Defendant created a hostile work environment for Plaintiff which was based on retaliation and was continuous in nature during her employment. The hostile work environment was a continuing violation pursuant to Title VII.

91.     Defendant had actual and constructive knowledge of the harassment because the harassment was open and obvious and because managerial employees participated in the harassment, but Defendant failed to take prompt action to correct or eliminate the harassment.

92.     Defendant had actual and constructive knowledge of the retaliatory harassment because managerial employees participated in the harassment, but Defendant failed to take prompt action to correct or eliminate the harassment.

93.     Defendant discriminated against Plaintiff by creating and tolerating a retaliatory hostile work environment, which included numerous disciplinary actions in violation of Title VII.

94.    Defendant engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

95.    As a result and consequence of Defendant's actions, Plaintiff has suffered anxiety, pain, financial damage, embarrassment, trauma and humiliation.

### THIRD CAUSE OF ACTION
### Discrimination (Pregnancy) in Violation of Title VII

96.    On October 31, 2022, Plaintiff began working for Defendant under the supervision of Clayton Manning.

97.    Plaintiff discovered that she was pregnant during March 2023, after a visit to physician.

98.    During March 2023, Plaintiff asked that she not be required to perform job duties which aggravated her pregnancy, such as jobs which require climbing in and out of cars.

99.    After being informed that Plaintiff was pregnant, Defendant failed to accommodate Plaintiff's pregnancy.

100.   Subsequently, Plaintiff suffered from postpartum depression after she miscarried and lost her baby.

101.   After being informed that Plaintiff was suffering from postpartum depression, Defendant failed to accommodate Plaintiff's pregnancy.

102.   Instead, Assistant Manager Tony (LNU) engaged in retaliatory harassment because he did not like the fact that Plaintiff had to miss work.

103.   The Defendant's practices and acts were a direct violation of rights secured to Plaintiff by Title VII.

104.   Defendant's actions violated Title VII as Plaintiff was treated unequally and was treated differently from men and non-pregnant female employees.

105.   Defendant's excuse that Plaintiff was tardy or absent was pretextual and not a valid excuse because she was always following her doctor's instructions which she promptly communicated to Defendant.

**FOURTH CAUSE OF ACTION**
**Discrimination Under the Pregnant Workers**
**Fairness Act / Failure to Accommodate**

106.   Plaintiff suffered from a known limitation which was related to, affected by, or arose out of pregnancy, childbirth or related medical condition (i.e. stillbirth).

107.   Plaintiff informed Defendant of her pregnancy-related medical condition and requested, as a reasonable accommodation which to take intermittent leave in order to address her postpartum depression.

108.   Plaintiff was a qualified employee under Section 102(6) of the PWFA, 42 U.S.C. § 2000gg(6), because she could perform the essential functions of the job with the accommodation of intermittent leave which would assist her recovery from postpartum depression.

109.   Defendant has intentionally discriminated against Plaintiff by failing to accommodate her known limitation, which was related to, affected by, or arose out of her pregnancy-related medical condition, in violation of the PWFA, 42 U.S.C. § 2000gg-1(1).

110.   The unlawful employment practices complained of were intentional and done with malice or with reckless indifference to Plaintiff's federally protected rights.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 12112**
**(Discrimination under the Americans with**
**Disabilities Act / Failure to Accommodate)**

111. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

112. Since March 2023, through the present, Plaintiff has been physically and mentally impaired due to disabilities associated with her pregnancy and miscarriage, including post-partum depression.

113. At all relevant times, Plaintiff's disabilities associated with her pregnancy have substantially limited her major life activities including but not limited to eating, sleeping, working, thinking, concentrating, and interacting with others, and dressing herself. Plaintiff's post-partum depression substantially limits her major life activities of her normal routine, occupational functioning including her ability to interact with others.

114. At all relevant times, Plaintiff was qualified as "disabled" pursuant to the ADA because she was actually impaired as described in 42 U.S.C. § 12102(1)(A).

115. Plaintiff requested reasonable accommodations. Specifically, she asked to be allowed to work in positions which do not aggravate her condition and to take intermittent leave as necessary.

116. At all relevant times, Plaintiff was qualified to perform the essential duties of her position with the requested reasonable accommodation.

117. Defendant did not make a good faith effort to accommodate Plaintiff's disabilities.

118. All the accommodations that Plaintiff requested were reasonable.

119.  None of the accommodations that Plaintiff requested would have created undue hardship for Defendant.

120.  Defendant failed to communicate with Plaintiff meaningfully and in good faith concerning her disabilities and requested accommodations.

121.  Defendant discriminated against Plaintiff in violation of the ADA by refusing to accommodate her disabilities associated with her pregnancy and miscarriage.

122.  Defendant knowingly and intentionally discriminated against Plaintiff because of her disabilities associated with her pregnancy and miscarriage.

123.  Defendant is liable for the acts and omissions of its agents and employees.

124.  Plaintiff suffered injuries as a result of Defendant's failure to reasonably accommodate her disabilities.

125.  Defendant's failure to accommodate Plaintiff's disabilities was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

126.  Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when it refused to provide a reasonable accommodation for her disabilities.

### SIXTH CAUSE OF ACTION
### (FMLA Interference)

127.  Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

128.  At all relevant times, Plaintiff was an "eligible employee" within the meaning of the FMLA.

129.  At all relevant times, Defendant met the definition of an "employer" under the FMLA because Defendant had 50 or more employees during the current and/or preceding calendar year.

130.    Defendant violated the FMLA by unlawfully interfering with, restraining, and/or denying the exercises of Plaintiff's FMLA rights by, *inter alia*, terminating her employment.

131.    As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief, including but not limited to recovery of her attorneys' fees, costs, in addition to interest at the prevailing interest rate.

132.    Defendant's unlawful action constitute bad faith, malicious, willful, and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 12203, 42 U.S.C. § gg-2, and 29 U.S.C. § 2615**
**(Retaliatory Harassment under Title VII, the PWFA, the ADA, and the FMLA)**

133.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

134.    Plaintiff participated in an activity protected under federal law when she opposed an unlawful employment practice when she complained about sexual harassment.

135.    Plaintiff engaged in protected activity when she asked Defendant for reasonable accommodations for her disabilities associated with her pregnancy. Plaintiff had numerous conversations with Defendant's supervisors and Human Resources representatives about her postpartum depression.

136.    Plaintiff engaged in protected activity when she opposed Defendant's refusal to accommodate her disabilities and its retaliation against her for her protected activity.

137.    Plaintiff participated in an activity protected under federal law when she filed a charge of discrimination with the EEOC.

138.   Defendant subjected Plaintiff to an adverse employment action, that is a pattern of retaliatory harassment.

139.   Plaintiff was subjected to adverse employment action because of her participation in protected opposition and protected activity.

140.   As a direct result of Plaintiff's request for a reasonable accommodation and opposition to conduct prohibited by Title VII, the PWFA, and the ADA, Defendant retaliated against Plaintiff by subjecting her to a pattern of retaliatory harassment.

141.   Defendant treated Plaintiff less favorably than her similarly situated counterparts who did not engage in protected activity.

142.   Defendant interfered with Plaintiff in the exercise and enjoyment of her rights under Title VII, the PWFA, and the ADA by subjecting her to a pattern of retaliatory harassment.

143.   Defendant is liable for the acts and omissions of its agents and employees. Defendant, either directly or by and through its agents, retaliated against Plaintiff and caused her injuries, damages, and losses.

144.   Defendant's retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

145.   Defendant's conduct was with malice or reckless indifference to Plaintiff's federally protected rights under Title VII, the PWFA, and the ADA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant:

A.   A declaratory judgment that the actions, conduct, and practices of Defendant complained

of herein violate the laws of the United States;

B.        An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.        An order directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory conduct in violation of Title VII, the PWFA, the ADA and FMLA, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.        An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security, and other benefits of employment;

E.        An award of damages for any and all other monetary and non-monetary losses suffered by Plaintiff, including compensatory and consequential damages, damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering, on all claims allowed by law in an amount to be determined at trial, plus prejudgment interest;

F.        Punitive damages on all claims allowed by law in an amount to be determined at trial;

G.        An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorney's fees to the fullest extent permitted by law;

H.        Pre- and post-judgment interest at the lawful rate; and

I.        Such other and further as the Court may deem just and proper, and any other relief as allowed by law.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated this 9th day of December 2024.

Respectfully submitted,

*/s/ H. Wallace Blizzard*
H. Wallace Blizzard (asb-8969-b59h)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0593 (phone/text)
(205) 314-0793 (facsimile)
wblizzard@wigginschilds.com

*Counsel for Plaintiff*

**Plaintiff requests this Honorable Court to serve via certified mail upon Defendant the following: Summons, Complaint.**

**Defendant's Address:**
Hyundai Motor Manufacturing Alabama, LLC
c/o C.T. Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104

*/s/ H. Wallace Blizzard*
H. Wallace Blizzard (asb-8969-b59h)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0593 (phone/text)
(205) 314-0793 (facsimile)
wblizzard@wigginschilds.com